**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **THEA P.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 18 C 8058** |
| | ) | |
| **ANDREW M. SAUL,** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Thea P. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act ("SSA"). (Doc. 1). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the case was reassigned to this Court. (Docs. 7, 9). The parties filed cross-motions for summary judgment. (Docs. 17, 28). After careful review of the record and the parties' respective arguments, the Court concludes that the case must be remanded for further proceedings as outlined below. The Court therefore denies the Commissioner's motion and grants Plaintiff's motion and request for remand.

## BACKGROUND

### I.     Procedural History

Plaintiff applied for DIB on May 28, 2015 and SSI on June 12, 2015, alleging disability since January 1, 2011 due to bipolar disorder, depression, psychosocial stress, and neurotic disorder. (R. 15, 66-67, 87-88, 111-12, 129-34, 211-19, 239, 298). Born in

1989, Plaintiff was 21 years old at the time of the alleged onset date (R. 22, 66, 89, 102), which is defined as a younger individual. 20 C.F.R. § 404.1563(c).[1] Her date last insured was March 31, 2016. (R. 15, 78, 102, 107, 239, 298).[2]

The Social Security Administration denied Plaintiff's applications initially on August 7, 2015 and on reconsideration on October 16, 2015. (R. 15, 86, 87, 122, 123). Plaintiff then requested a hearing, which was later held before Administrative Law Judge ("ALJ") Janice Bruning on August 23, 2017, where Plaintiff was represented by counsel. (R. 15, 32-57, 136-38). Both Plaintiff and Vocational Expert ("VE") James Breen testified at the hearing. (R. 35-56).

The ALJ denied Plaintiff's claims in a decision dated December 8, 2017. (R. 15-24). The ALJ found that Plaintiff's generalized anxiety disorder, bipolar disorder, and depression are severe impairments, but they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17-19). The ALJ concluded that Plaintiff was not disabled from her January 1, 2011 alleged onset date through the date of the decision because she retains the residual functional capacity ("RFC") to perform the full range of work at all exertional levels with mental limitations, as described to the VE, and is capable of performing jobs that exist in significant numbers in the national economy. (R. 16, 20, 23-24). The Appeals Council denied Plaintiff's request for review on October 4, 2018 (R. 1-6), rendering the ALJ's December 2017 decision the

---

[1]     Because the regulations governing DIB and SSI are substantially identical, for convenience, only the DIB regulations are cited herein.

[2]     While the disability report and disability determination paperwork includes a date last insured of June 30, 2013 (R. 78, 102, 107, 239, 298), the ALJ's decision states that the date last insured was March 31, 2016 (R. 15). The parties' briefs are silent on this point.

final decision of the Commissioner reviewable by this Court. *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

In support of her request for reversal or remand, Plaintiff argues that the ALJ erred in: (1) failing to find that Plaintiff's mental impairments satisfied a listed impairment; (2) determining the mental and physical components of the RFC; (3) evaluating the opinion evidence; and (4) assessing Plaintiff's subjective symptom allegations. As explained below, the Court concludes that remand is required to reconsider the mental RFC determination, reevaluate the opinion evidence, and reassess Plaintiff's subjective statements.

## II. Medical and Other History

At the time of the hearing, Plaintiff was 28 years old, was unmarried with no children under the age of eighteen, lived with her parents, and had been working part-time as a home care aide since October 2016. (R. 35-37, 331). She completed high school and had an associate degree in photography. (R. 35). Plaintiff previously worked as a dog groomer, animal caretaker, and sales associate. (R.37-38, 52).

### A. Mental

Long before the alleged onset date of January 1, 2011, Plaintiff was evaluated for educational services in 2004 (at age 14), including administration of the Wechsler Intelligence Scale for Children (Third Edition), which reflected a Full Scale IQ of 106 in the "average range". (R. 378, 490-91, 940-41, 952, 982, 1016-17). She received special education services during the 2004/2005 and 2005/2006 school years. (R. 502, 965, 1009, 1030).

3

Plaintiff also received mental health treatment for a number of years before January 2011. She had in-patient treatment for depression in October 2003, May 2004, and July/August 2004. (R. 395-98, 464-81, 938-39). Plaintiff also regularly (generally, every few months) saw Ralph Cusick, M.D. for psychiatric treatment and medication management beginning in December 2003 and continuing through June 2017. (R. 430-46, 449-51, 1038-71, 1304-33, 1447-50, 1508-14).

Throughout 2011, Dr. Cusick consistently noted that Plaintiff was able to manage basic activities of daily living and was not a danger to herself or others. (R. 1067-69). During the first half of the year, Plaintiff (then age 21) was working part-time and looking for full-time work, and Dr. Cusick described her condition as stable. (R. 1069-70). In August 2011, Plaintiff lost a job she "loved" at a pet store and complained of panic episodes, insomnia, crying, and restlessness. (R. 1069). Dr. Cusick diagnosed Plaintiff with depression and anxiety and noted that bipolar II "appear[ed] likely". (*Id.*). In September and October 2011, Plaintiff was looking for work and "appear[ed] stable". (R. 1068). In November and December 2011, Plaintiff was depressed and felt worse after Dr. Cusick adjusted her medication. (R. 1067).

During 2012, Dr. Cusick diagnosed Plaintiff with depression, bipolar II disorder, and generalized anxiety disorder and consistently noted that she was able to manage basic activities of daily living and was not danger to herself or others. (R. 1061-66). In March 2012, Plaintiff's mood was improving and, in May 2012, was even and predictable, and she was looking for work and applying to school. (R. 1064-65). In September 2012, she was taking photography classes and feeling "anhedonic, listless, sad." (R. 1062). In

October 2012, Plaintiff reported starting to feel better and liking photography class, and Dr. Cusick noted that her "[d]epression, et al [were] improving". (R. 1061).

In 2013, Dr. Cusick diagnosed Plaintiff with depression, "?" bipolar II disorder, generalized anxiety disorder, panic disorder, and insomnia. (R. 1052-60). On psychiatric examination in January 2013, Dr. Cusick observed that Plaintiff was depressed, tearful/sad, and anxious, but otherwise noted normal findings, including attention/concentration and memory. (R. 1059). In May and October 2013, Dr. Cusick noted normal findings on psychiatric examination, including affect/mood, attention/concentration, and memory. (R. 1052, 1056). Plaintiff was experiencing stress, but functioning well, feeling reluctant to make any changes, and being compliant with medication. (*Id.*).

In 2014, Dr. Cusick diagnosed Plaintiff with bipolar II disorder and generalized anxiety disorder and consistently noted her good medication compliance. (R. 1038-51). Although in February 2014 Plaintiff was functioning okay as a full-time student with decent grades, in March 2014 she was finding classes difficult and, in July 2014, taking one class and having difficulty concentrating. (R. 1044, 1048, 1050). Her symptoms included anhedonia, fatigue, or loss of energy; crying spells; and feelings of worthlessness and hopelessness. (R. 1044). On psychiatric examination in September 2014, Dr. Cusick observed that Plaintiff was depressed, anxious, and worried and had difficulty staying on task. (R. 1042). In October and December 2014, Plaintiff felt better after Dr. Cusick adjusted her medication, and he noted normal findings on psychiatric examination, including euthymic mood and "good" attention/concentration. (R. 1038, 1040).

During 2015 (the year Plaintiff turned 26 and applied for DIB and SSI in May and June, respectively), Dr. Cusick diagnosed her with bipolar II disorder, generalized anxiety disorder, and borderline personality disorder and consistently noted her good medication compliance. (R. 1304-17). In February 2015, Dr. Cusick observed that Plaintiff was easily distracted, but for the rest of the year found her attention/concentration normal on psychiatric examination. (R. 1304, 1306, 1308, 1313). Throughout the year, Plaintiff's mood, affect, and anxiety fluctuated between depressed, anxious, and worried and stable and well. (R. 1304, 1306, 1308, 1310, 1313, 1315). In November 2015, she denied conflict with family, friends, and colleagues. (R. 1315).

In 2016, Dr. Cusick again diagnosed Plaintiff with bipolar II disorder, generalized anxiety disorder, and borderline personality disorder and consistently noted her good medication compliance. (R. 1318-33). Plaintiff reported "tending to isolate" and feeling "depleted in the evening." (R. 1318, 1321). For most of the year, Dr. Cusick observed that Plaintiff generally was depressed and anxious, but he noted normal findings on mental status examination in March, April, and December 2016 with respect to mood, anxiety, and attention/concentration. (R. 1318, 1321, 1323, 1326, 1328, 1332).

In early 2017, Dr. Cusick continued to diagnose Plaintiff with bipolar II disorder, generalized anxiety disorder, and borderline personality disorder and consistently noted her good medication compliance. (R. 1447-50, 1508-14). Dr. Cusick observed that Plaintiff was depressed, anxious, worried, and irritable with poor attention concentration and intermittent suicidal/homicidal ideation early in the year. (R. 1447-50, 1511-12). In April 2017, Dr. Cusick submitted a letter stating that: he had treated Plaintiff since 2003 for bipolar II disorder and generalized anxiety disorder; she was "chronically

6

symptomatic"; he believed that she would "not be able to work full time in the foreseeable future"; her part-time work was "limited by exacerbations in her condition"; and he recommended that Plaintiff apply for disability benefits and supported her application. (R. 1466). In June 2017, Dr. Cusick noted Plaintiff's euthymic mood and otherwise normal findings on mental status examination despite ongoing anxiety, and she reported feeling better than she had in many months, working up to 27 hours per week as a caregiver, and liking the work. (R. 1513-14).

In addition to treating with Dr. Cusick in early 2017, Plaintiff also had weekly individual therapy sessions with Rachel Weaver Rivera, Q.M.H.P. from January to May 2017. (R. 1472-1506). Plaintiff complained to Ms. Rivera of struggling to be an adult, and she was considering ways to improve her life, including possibly taking photos again and looking for a different part-time job. (R. 1474, 1476, 1480, 1482). Ms. Rivera observed that Plaintiff exhibited ambivalence about differentiating from her parents, taking control over her choices, taking greater responsibility for her life, and making change. (R. 1472, 1484, 1486, 1488, 1495). Ms. Rivera also observed that Plaintiff took small steps toward taking more ownership of her future, but was not ready to take action and did not want to talk about ways to move forward toward her long-term goal of working in a field that brought her more satisfaction and was not taking necessary steps to alleviate her symptoms of depression and to make changes leading to her long-term goals. (R. 1495, 1499). Ms. Rivera noted that Plaintiff was able to function in her part-time employment situation and care for her physical needs. (R. 1499).

Plaintiff reported anxiety related to going to the Women's March in Washington and having a conflict with her parents. (R. 1478, 1480). Ms. Rivera noted that Plaintiff

felt like she had "no choice in family matters", such as "feeling 'forced' to help her sister move", but did decide to attend a family wedding. (R. 1472, 1503). Ms. Rivera wrote that Plaintiff was "further isolated from her family" and disconnected from her father, and relations with her family "continue[d] to dissolve." (R. 1480, 1482, 1484). Plaintiff also felt disappointed, betrayed, and unaccepted by others; had lost significant friendships; and expressed ambivalence about having greater social connections. (R. 1484, 1499). Ms. Rivera noted that Plaintiff had "reached out for support to her 'Mommy Anna'" and planned to bring "her support person 'Mommy Anna'" to her disability hearing. (R. 1480, 1497).

Ms. Rivera documented Plaintiff's pursuit of disability benefits, including her reported need to stay in therapy for her disability case and her efforts to retain a lawyer. (R. 1472, 1474, 1480, 1493, 1497, 1499, 1505). Ms. Rivera also noted that Plaintiff came to therapy because her doctor told her to, more actively engaged in therapy as the conclusion of the sessions approached, and expressed interest in continuing with group therapy after individual therapy ended. (R. 1493, 1503, 1505). Plaintiff thought her life had improved since starting therapy, but felt no pride in graduating (presumably from the associate degree program, although the note does not specify) with a 4.0, no purpose in life, and no drive to date. (R. 1492). Plaintiff understood the importance of being consistent with medication and reported working with her psychiatrist to "'get her medications right.'" (R. 1476, 1478). Ms. Rivera noted that her psychiatrist wanted to take her off one antidepressant, which Plaintiff interpreted as indicating that she had gained some skills in counseling. (R. 1501).

8

In July 2017, Ms. Rivera submitted a "Report by Case Manager or Therapist" stating that she saw Plaintiff for weekly individual therapy sessions from September 2016 to May 2017 (although the record only includes counseling notes beginning in January 2017) for bipolar I disorder with panic attacks. (R. 1548-50). Ms. Rivera stated that Plaintiff could not form "mutually supportive relationships", had difficulties with supervisors, and experienced ongoing conflict with her family. (R. 1548). Plaintiff had marked restriction in socialization, but not daily activities and sustained concentration, attention, or task completion. (R. 1548-49). She was not able to function in a competitive work setting eight hours per day five days per week. (R. 1549). Plaintiff experienced fatigue and other (unspecified) side effects from medication. (R. 1549). She had made "some progress" in response to treatment and was "capable of working, but struggle[d] to maintain healthy relationships." (R. 1549-50).

### B.   Physical

Several years before the alleged onset date of January 1, 2011, Plaintiff underwent a neurological evaluation in May 2007 for headaches that she had experienced following a nasal fracture four years earlier, and she was diagnosed with migraines. (R. 448,1244-47).

Plaintiff also received treatment for various physical conditions after the January 2011 alleged onset date. In October 2013, Plaintiff complained of back pain and was diagnosed with cervical radiculopathy. (R. 546, 605, 609, 642-43, 657, 749-57, 929-34, 1134-35, 1192-93, 1274-75). The next week, she saw a chiropractor, who implemented a treatment plan of two to three visits per week for approximately three to four weeks. (R. 1073-87). Imaging of the cervical spine in early November 2013 revealed "[s]pinal

biomechanical alterations", and treatment through late November 2013 generally resulted in increased range of motion and improvement. (R. 1075-81, 1087). In December 2013, another treatment plan of one to two visits per week for approximately three to four weeks was prescribed, and Plaintiff's prognosis was described as good. (R. 1082-83). She continued to receive treatment through January 2014, which generally resulted in increased range of motion and improvement. (R. 1084-86).

In August 2014, Plaintiff complained of pain in her left foot after dropping a vacuum on it. (R. 544-45, 591, 772-73, 1138, 1162-63, 1278-79). Imaging revealed no fracture or dislocation. (R. 591).

In January 2015, Plaintiff underwent a hysterectomy and bilateral salpingectomy surgery (removal of the uterus and both fallopian tubes) and also received a chest x-ray based on complaints of chest pain. (R. 534-43, 547-66, 573-77, 582, 584-90, 593, 598, 603-04, 607-08, 628-41, 651-52, 655-56, 658, 661-67, 712, 720, 735-48, 764-71, 829-48, 854, 861, 903-28, 1170-71, 1180-84, 1334-66, 1387). A March 2015 CT scan for abdominal pain showed a "partial small bowel obstruction". (R. 567-72, 579-81, 583, 592, 594-97, 599-602, 606, 610-27, 644-50, 653-54, 660, 669-70, 694-98, 708-11, 721-34, 758-63, 774-828, 849-53, 856-60, 863-902, 1144-46, 1185-91, 1284-87, 1367-86, 1453-65). And an April 2015 CT scan revealed an abscess and bowel obstruction. (R. 578, 855, 1194-96, 1388, 1469-71).

Some treatment records also referenced Plaintiff's diagnosis (at an unknown time not documented in the record) of Von Willebrand disease, a bleeding disorder in which blood does not clot well. (R. 658, 784). *See* Mayo Clinic, *available at* https://www.mayoclinic.org/diseases-conditions/von-willebrand-disease/symptoms-

causes/syc-20354978 (last visited May 22, 2020). A doctor treating Plaintiff for Von Willebrand disease sent a letter in connection with Plaintiff's January 2015 surgery, giving instructions to administer certain medication shortly before surgery. (R. 658, 764). In addition, the March 2015 treatment notes for abdominal pain recommended a hematology/oncology consultation for Plaintiff's Von Willebrand disease if she needed an operation. (R. 1190).

In October 2016, Plaintiff underwent a physical examination, which cleared her to work as a home health aide. (R. 1515-23). In December 2016, Plaintiff complained of right leg pain and fatigue, and the doctor recommended: stretching, icing, using a foam roller, and wearing better shoes with arch support for the pain; and, after normal lab results, exercising "at a much lower level" and increasing gradually for the fatigue. (R. 1524-32).

III.    **State Agency Reviewing Physician Opinions**

On July 22, 2015, Donald Henson, Ph.D. opined that:

> [Plaintiff] is involved in outpatient psychiatric treatment for symptoms of anxiety and depression which is generally well controlled according to clinical records. While she would have difficulty satisfactorily performing detailed activities of a somewhat complicated nature, she performs chores and leisure activities inside/outside the home and possesses sufficient cognitive and attentional abilities to perform simple routine activities which are within the limits of her physical capabilities and have few social demands.

(R. 74-75). On October 14, 2015, David Gilliland, Psy.D. opined that Plaintiff had moderate mental limitations in the ability to understand, remember, and carry out detailed instructions, moderate mental limitations in social interactions, and no significant mental limitations in adaptation, and she was "mentally capable of performing simple tasks in a

routine schedule with reasonable rest periods and limited interaction with general public." (R. 99).

## IV.    Administrative Hearing

On August 23, 2017, Plaintiff appeared with counsel at a hearing before ALJ Bruning. (R. 15, 32-57). Plaintiff testified that she lived in a two-flat with her parents. (R. 36). She thought she would be happier living by herself, but did not think she could support herself financially. (R. 46). Plaintiff worked 24 hours per week as a home care aide for one client. (R. 37-38). Her duties included light housework, cooking, laundry, sometimes attending the client's medical appointments, and sometimes making sure he took his medications. (*Id.*). She did not think she could work more because "it just takes up all of my emotional energy and I can't get anything done for myself." (R. 47). Plaintiff "[s]ometimes" had trouble concentrating, paying attention, or accomplishing the job. (R. 48). She got drowsy or groggy from medication and had fallen asleep at work. (*Id.*).

Plaintiff took medication for depression and anxiety, and she received counseling. (R. 38-39). She had insomnia and took medication to sleep. (R. 40). She attended group therapy, but did not "trust" one of the leaders and decided not to go to that leader's sessions anymore. (R. 42, 48-49). She experienced panic attacks, including one for half an hour the night before the hearing, for which medication was effective. (R. 49-50). Plaintiff had no friends, but a woman named Anna Mason, who she described as her "support system" and "the mother I choose", accompanied her to a prior hearing that was continued so Plaintiff could obtain representation. (R. 42, 58-65).

Plaintiff did not receive treatment for back pain because insurance would not cover it, but took medication prescribed by her general physician. (R. 38). She had "[p]retty

much" daily abdominal pain from a history of cervical cancer, endometriosis, and hysterectomy. (R. 46-47). She got migraine headaches once a week that lasted all day. (R. 50-51). Plaintiff could walk about three to four blocks before stopping because her ankles hurt; stand less than 30 minutes; sit for an hour before needing to move; and lift maybe 20 pounds. (R. 39). She had some difficulty climbing stairs, crouching, and reaching overhead. (R. 39-40).

Plaintiff drove, including to work and the hearing. (R. 41). She prepared food, went to the grocery store, did laundry, washed dishes, made the bed, cleaned, and took out the garbage. (R. 41-42). She stopped mowing the lawn about a year earlier because of allergies and did not do snow removal or yard work. (R. 42). Plaintiff read books, watched television, cared for a pet cat and rabbit, checked email on her cell phone, and texted. (R. 43-44). She tried to draw at least twice a week and did so for a "couple" of hours. (R. 44). She stopped doing photography right after she graduated in 2015 because it made her "kind of anxious." (R. 44-45).

In response to questions from the ALJ, the VE testified about the ability of a person of Plaintiff's age, education, and work experience who could perform work at the sedentary level and was limited to understanding, remembering, or carrying out no more than simple routine tasks; performing the same tasks day in and out; having no public contact and no more than occasional contact with coworkers or supervisors; not being required to engage in teamwork, meaning any work with others to complete the same task, but could work independently; and not having strict quotas, meaning someone checking up to see if the person was satisfying a goal or quota or keeping up with other employees during the day, but doing work where performance was measured by what

13

was completed by the end of the work day.  (R. 54).  According to the VE, such a person could perform jobs that existed in significant numbers in the national economy, such as Eyeglass Assembler, Circuit Board Assembler, and Costume Jewelry Maker.  (R. 54-55).[3] In response to the ALJ's questions about employers' tolerance of on- and off-task behavior and absenteeism, the VE also testified that employers would not tolerate an individual being off task more than 15 percent of the workday outside of regularly-scheduled breaks and being absent more than once per month.  (R. 55-56).

## DISCUSSION

**I.    Governing Standards**

**A.    Standard of Review**

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the SSA. In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the applicable regulations.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'"  *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)).  The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pepper v. Colvin*, 712 F.3d

---

[3]    The VE also identified jobs (Hand Packager, Mail Sorter, and Office Helper) that could be performed by a person capable of light work with the same mental limitations except for one: the person could work with others to complete the same task.  (R. 52-53).  The ALJ's decision and the parties' briefs do not address this discrepancy in the hypothetical questions posed to the VE.

351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

### B. Five-Step Inquiry

To recover disability benefits under the SSA, a claimant must establish that he is disabled within the meaning of the SSA. *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016). A claimant is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4)

if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520). If the claimant meets his burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

## II.   Analysis

### A.   Listings

At step 3, a claimant bears the burden to prove that her medical condition met or equaled an impairment found in the Listing of Impairments. *Anthony G. v. Saul*, No. 17 C 4393, 2020 WL 439964, at *4 (N.D. Ill. Jan. 28, 2020) (citing *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006)). If a claimant has such an impairment, then she is presumptively eligible for benefits. *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) (citing 20 C.F.R. § 404.1520(d)); *see also Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); *Anthony G.*, 2020 WL 439964, at *4. "While the Listings 'specify the criteria for impairments that are considered presumptively disabling . . . [a] claimant may also demonstrate presumptive disability by showing that her impairment is accompanied by symptoms that are equal in severity to those described in a specific listing.'" *Anthony G.*, 2020 WL 439964, at *4 (citing *Barnett*, 381 F.3d at 668); *see* 20 C.F.R. §§ 404.1525(a), 404.1526(a). "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than perfunctory analysis of the listing." *Minnick*, 775 F.3d at 935 (citing *Barnett*, 381 F.3d at 668); *Anthony G.*, 2020 WL 439964, at *4. A finding that a claimant's symptoms are medically equivalent

16

to a listed impairment requires an expert opinion. *Minnick*, 775 F.3d at 935-36 (citing *Barnett*, 381 F.3d at 670-71); *Anthony G.*, 2020 WL 439964, at *4.

Here, the ALJ considered Listings 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive compulsive disorders), and 12.15 (trauma- and stressor-related disorders) and concluded that Plaintiff's mental impairments did not meet or medically equal them. (R. 18). *See* 20 C.F.R. § 404, Subpt. P, Appx. 1, § 12.00(A)(1); 20 C.F.R. §§ 404.1520(d), 404.1525(a). To meet the required level of severity for those Listings, Plaintiff needed to satisfy the "paragraph B" criteria, which required mental impairments resulting in marked limitations in at least two of the following functional areas: (1) understanding, remembering, or applying information; (2) interacting with others; (2) concentrating, persisting, or maintaining pace; or (4) adapting or managing oneself. (R. 18). *See* 20 C.F.R. § 404.1520a(c)(3); 20 C.F.R. § 404, Subpt. P, Appx. 1, §§ 12.00(A)(2)(b), 12.00(E).[4] A marked limitation means that "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." (R. 18). 20 C.F.R. § 404, Subpt. P, Appx. 1, § 12.00(F)(2)(d). The ALJ concluded that Plaintiff had mild limitation in understanding, remembering, or applying information; mild to moderate limitation in interacting with others; moderate limitation in concentrating, persisting, or maintaining pace; and mild limitation in adapting or managing oneself. (R. 18-19).

Plaintiff challenges the ALJ's listed impairment finding, but the grounds for doing so are somewhat unclear. While Plaintiff asserts in a conclusory fashion that the ALJ

---

[4] Plaintiff does not contend that she has extreme limitations in any functional area and also does not challenge the ALJ's assessment of the "paragraph C" criteria (*see* Doc. 18, at 8-10), so the Court does not address those requirements.

should have found "listing level equivalence" (Doc. 18, at 8, 10; Doc. 29, at 3), she focuses on arguing that the ALJ should have found marked limitation in the functional areas required to meet the Listings under the "paragraph B" criteria (Doc. 18, at 8-10). Specifically, Plaintiff disputes the ALJ's findings with regard to understanding, remembering, or applying information; adapting or managing oneself; and interacting with others. (Doc. 18, at 8-10).

With respect to understanding, remembering, or applying information, the ALJ found mild limitation based on the absence of evidence of learning or intellectual disorder; and Plaintiff's ability to work as a home companion, attend school and obtain an associate degree, use a lawn mower and laundry machines, do chores, drive and operate a car, read books, go out alone without getting lost, care for pets, use a cell phone and email, handle written instructions, and function without medical reminders. (R. 18-19). Although Plaintiff contends that the ALJ should have mentioned that she received special education services in high school (Doc. 18, at 8), the ALJ considered Plaintiff's Full Scale IQ score of 106 (from the evaluation for those services), which indicated average functioning. (R. 21; *see* R. 378, 490-91, 940-41, 952, 982, 1016-17). Also, contrary to Plaintiff's claim (Doc. 18, at 8), the ALJ acknowledged the part-time nature of her work as a home companion (R. 20), the exhaustion she described experiencing after work (R. 21), and her reports of problems paying attention at work. (R. 19). Notably, Plaintiff does not contest the ALJ's reliance on other activities in which she reportedly engaged.

As for adapting or managing oneself, the ALJ found mild limitation based on Plaintiff's ability to care for herself and others. (R. 19). While Plaintiff contends that the ALJ dismissed her panic attacks, including one before the hearing (Doc. 18, at 10), the

18

ALJ acknowledged that panic attack and the stress of the hearing and accommodated for the problem in the RFC determination. (R. 19). Notably, Plaintiff participated in the hearing despite any such difficulties. She also testified that medication was effective for her panic attacks. (R. 49-50). And she proffers no evidence of a greater degree of limitation resulting from panic attacks.

With regard to interacting with others, the ALJ found mild to moderate limitation based on Plaintiff's ability, despite reportedly experiencing panic attacks, to leave home regularly for work, to be in public to take clients to shop and visit the doctor, to attend a family wedding, and to help her sister move; and her lack of isolation since Plaintiff brought a friend from church to a prior hearing, worked, shopped, went to therapy, and kept in touch with others by text, email, and cell phone. (R. 19). As discussed above, the ALJ did not disregard Plaintiff's panic attacks. As discussed in Sections II.B, C, and D below, however, the ALJ did not consider the full extent of the treatment records and opinion evidence concerning Plaintiff's social limitations. Plaintiff does not dispute the activities referenced by the ALJ that she was able to engage in despite such limitations. But, even assuming solely for purposes of this argument that those difficulties rose to the level of marked limitation, a marked limitation in only one functional category is not sufficient to meet the Listings.

Finally, Plaintiff advances no real substantive argument that her condition equaled the Listings. State agency reviewing physicians concluded otherwise. (R. 87-88, 111-112). *See Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (explaining that Disability Determination and Transmittal Forms finding claimant not disabled "conclusively establish" consideration by a physician of medical equivalence, and ALJ may properly

rely on those medical experts' opinions). And Plaintiff points to no contradictory opinion. *See Filus v. Astrue*, 694 F.3d 863, 867 (7th Cir. 2012) (concluding that, where no physician contradicted state agency reviewing physicians' opinions that plaintiff did not meet or medically equal any listed impairment, ALJ did not err in accepting them).

For all of these reasons, the Court finds that remand is not required for reconsideration of the listed impairment finding.

### B.    RFC

A claimant's RFC is the maximum work that she can perform despite any limitations. *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *2. "Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012). Here, the ALJ determined that Plaintiff retained the RFC to perform the full range of work at all exertional levels with the following mental limitations: understanding, remembering, and carrying out no more than simple routine tasks; performing the same tasks day in and out; having no public contact and no more than occasional contact with coworkers and supervisors; not engaging in teamwork situations (meaning working with others to complete the same job tasks), but working independently; and not having strict quotas (meaning being checked up on to see if on pace with a set quota/goal or other employees), but doing work where performance is measured by what is completed by the end of the workday. (R. 20). Plaintiff challenges both the mental and physical components of the ALJ's RFC determination. (Doc. 18, at 10-11, 14-15; Doc. 29, at 4-5).

### 1. Mental

Plaintiff first argues that the RFC fails to account for Plaintiff's limitations of concentration, persistence, and pace as well as her deficits in interacting with others and adapting or managing herself. (Doc. 18, at 10-11). "As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014) (citations omitted). "Among the mental limitations that the VE must consider are deficiencies of concentration, persistence, or pace." *Varga v. Colvin*, 794 F.3d 809, 813-14 (7th Cir. 2015) (citations omitted). While the ALJ need not use the precise language "concentration, persistence, or pace," the Court "will not assume that the VE is apprised of such limitations unless she has independently reviewed the medical record." *Yurt*, 758 F.3d at 857.

Here, the ALJ found that Plaintiff has moderate difficulties of concentration, persistence, or pace. (R. 19). The ALJ crafted the RFC and corresponding hypothetical question to the VE to: limit Plaintiff to performing no more than simple routine tasks and performing the same tasks day in and out; and preclude strict quotas (i.e., keeping pace with a goal/quota or other employees), but permit Plaintiff's performance to be measured by what is completed by the end of the workday. (R. 20, 53-54).

First, the restriction to "simple routine tasks" is not adequate to account for Plaintiff's moderate limitations of concentration, persistence, or pace. As the Seventh Circuit has explained, "simple, routine, and repetitive" tasks refer to "unskilled work," meaning that which can be learned by demonstration in less than 30 days, which is unrelated to whether someone with difficulties maintaining concentration, persistence, or

pace can perform such work.  *Varga*, 794 F.3d at 814 (citations omitted).  For that reason, the Seventh Circuit has instructed that limitations to "simple routine tasks" and limited interaction with others are inadequate to convey limitations of concentration, persistence, and pace and temperamental deficiencies.  *See Yurt*, 758 F.3d at 855, 858-59 (rejecting hypothetical limiting claimant to performing unskilled tasks without special considerations, relating at least superficially with coworkers and supervisors, attending to tasks for sufficient periods of time to complete them, and not working around large numbers of people).  And, in any event, the ALJ stated that the RFC limiting Plaintiff to performing simple routine tasks day in and out addressed her mild limitation in adapting or managing herself, not her moderate limitation in concentration, persistence, or pace.  (R. 19).[5]

In addition, the elimination of strict quotas is not sufficient to address Plaintiff's moderate limitations of concentration, persistence, or pace.  The Seventh Circuit has rejected such a limitation "because there is no basis to suggest that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including a moderate limitation on concentration, persistence, and pace."  *DeCamp v. Berryhill*, 916 F.3d 671, 675-76 (7th Cir. 2019) (citations omitted) (rejecting RFC limitation to "'unskilled work' with

---

[5]     The Court sets aside the limitations on contact with others for purposes of this discussion of Plaintiff's difficulties of concentration, persistence, and pace.  While the Seventh Circuit has explained that a limitation on social interaction may be meant to address concentration difficulties or social function difficulties (*Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019)), here, the ALJ specified that Plaintiff's difficulties interacting with others were accommodated by the RFC limiting her contact with others and not requiring her to engage in teamwork.  (R. 21-22).  The ALJ also stated that Plaintiff's limitation in adapting or managing herself was considered in the RFC to reduce stress by limiting her to performing simple routine tasks day in and out, having no public contact and occasional coworker and supervisor contact, not engaging in teamwork, and not having strict quotas.  (R. 19).  The ALJ did not indicate that any of those same restrictions additionally were intended to address concentration difficulties (R. 19, 22), so there is no reason to consider those limitations on contact with others in the context of Plaintiff's difficulties of concentration, persistence, and pace.

no 'fast-paced production line or tandem tasks.'"); *see Dawn W. v. Berryhill*, No. 17 C 0190, 2019 WL 2085196, at *3-4 (May 13, 2019) (finding that RFC precluding periodic or hourly quotas and not requiring work at a fast or other particular pace did not clearly exclude tasks that plaintiff could not perform because of mild difficulties with concentration, persistence, or pace). No doctors rendered medical opinions on this particular restriction. (*See* R. 74-75, 99, 1466; *see also* R. 1548-50). Moreover, the ALJ attributed the RFC determination of no strict quotas to Plaintiff's limitation in adapting or managing herself, not her difficulties with concentration, persistence, or pace. (R. 19).

Further, even if the ALJ had intended the elimination of strict quotas to address difficulties of concentration, persistence, or pace, it remains unclear how the ALJ decided that Plaintiff could nonetheless perform work measured by the amount completed by end of day. Indeed, requiring Plaintiff "to meet end-of-day production requirements without keeping a particular pace throughout the day envisons 'a tortoise-and-the-hare scenario in which [the] plaintiff would be unable to keep pace consistently throughout the day but could somehow catch up later in the day,' and the ALJ did not point to anything in the record suggesting that Plaintiff would have such 'bursts of productive energy' throughout the day." *Dawn W.*, 2019 WL 2085196 at *3 (explaining that individual with issues concentrating, persisting, or maintaining pace may have problems meeting daily production requirements even if deferred to end of day) (citing *Novak v. Berryhill*, No 15 C 50236, 2017 WL 1163733, at *7 (N.D. Ill. Mar. 29, 2017) (finding limitation of no fast-paced or strict production quotas but ability to meet end of day requirements "vague" and unsupported by any medical opinion)).

Finally, in otherwise finding that an ALJ did not properly account for moderate difficulties with concentration, persistence, and pace, the Seventh Circuit also has considered the ALJ's failure to address VE testimony about an individual being off task while at work or being absent from work. *Winsted*, 923 F.3d at 476-77. In that regard too, as in *Winsted*, "it appears the ALJ disregarded testimony from the VE about a person with limitations in concentration, persistence, and pace." *Id.* at 477. Here, the ALJ specifically asked the VE about employers' tolerance of off-task behavior and absenteeism, and the VE responded that employers would not tolerate an individual being off task more than 15% percent of the workday and being absent more than once per month. (R. 55-56). But, as in *Winsted*, that testimony is "not reflected in the ALJ's decision." *Winsted*, 923 F.3d at 477.

For the foregoing reasons, the Court finds that remand is required because the RFC and corresponding hypothetical question to the VE do not incorporate Plaintiff's moderate limitations of concentration, persistence, and pace.

## 2. Physical

Plaintiff claims that the ALJ failed to accommodate her physical deficits and, in support, lists treatment she received for various physical conditions. (Doc. 18, at 6, 14-15; Doc. 29, at 5). The records confirm that Plaintiff received treatment for several physical ailments. But treatment alone does not undercut the RFC finding.

In October 2013, Plaintiff was diagnosed with cervical radiculopathy. (R. 546, 605, 609, 642-43, 657, 749-57, 929-34, 1134-35, 1192-93, 1274-75). She received chiropractic treatment through January 2014, which generally resulted in increased range of motion and improvement. (R. 1075-81, 1084-86). In August 2014, Plaintiff complained

24

of pain in her left foot after dropping a vacuum on it. (R. 544-45, 591, 772-73, 1138, 1162-63, 1278-79). But imaging revealed no fracture or dislocation. (R. 591).

In January 2015, Plaintiff underwent hysterectomy and bilateral salpingectomy surgery. (R. 534-43, 547-66, 573-77, 582, 584-90, 593, 598, 603-04, 607-08, 628-41, 651-52, 655-56, 658, 661-67, 712, 720, 735-48, 764-71, 829-48, 854, 861, 903-28, 1170-71, 1180-84, 1334-66, 1387). In March and April 2015, Plaintiff had an abscess and bowel obstruction. (R. 567-72, 578-81, 583, 592, 594-97, 599-602, 606, 610-27, 644-50, 653-54, 660, 669-70, 694-98, 708-11, 721-34, 758-63, 774-828, 849-53, 855-60, 863-902, 1144-46, 1185-91, 1194-96, 1284-87, 1367-86, 1388, 1453-65, 1469-71). Also in 2015, Plaintiff's diagnosis of Von Willebrand disease required administration of medication in connection with surgery. (R. 658, 764, 1190).

In December 2016, Plaintiff was prescribed stretching, icing, using a foam roller, and wearing better shoes for complaints of right leg pain and gradually increasing exercise for complaints of fatigue. (R. 1524-32).

Significantly, none of those treatment records reveal any persistent physical functional limitations resulting from those conditions. Moreover, while the RFC determination includes no physical restrictions, the VE's testimony nonetheless supports the availability of work at the sedentary level that Plaintiff could perform. (R. 54-55). And Plaintiff points to no evidence of more restrictive physical limitations. Accordingly, the Court concludes that the physical RFC determination need not be revisited on remand.

### C. Opinion Evidence

#### 1. Dr. Cusick and Ms. Rivera

Plaintiff first challenges the ALJ's evaluation of the treating source opinions of Dr. Cusick and Ms. Rivera regarding Plaintiff's mental impairments. (Doc. 18, at 5, 11-12; Doc. 29, at 4-5). A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *Gerstner v. Berryhill*, 879 F.3d 257, 261 (7th Cir. 2018) (noting that this rule governs claims filed before March 27, 2017); *see* 20 C.F.R. § 404.1520c(a). If the opinion is contradicted by other evidence or is internally inconsistent, the ALJ may discount it as long as she provides an adequate explanation for doing so. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). That is to say, the ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011), and then determine what weight to give it considering "'the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion.'" *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010) (quoting *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2008)); 20 C.F.R. § 404.1527(c)(2)-(6).

In April 2017, Dr. Cusick opined that Plaintiff was "chronically symptomatic" from bipolar II disorder and generalized anxiety disorder, she would "not be able to work full time in the foreseeable future", and her part-time work was "limited by exacerbations in her condition". (R. 1466). The ALJ did not discuss any aspect of Dr. Cusick's opinion, but afforded it "[n]o weight" because Dr. Cusick was not familiar with the disability

determination criteria and did not refer to the treatment records to support his conclusions regarding part-time work. (R. 22). That explanation is not sufficient.

The Commissioner argues that the ALJ properly discounted Dr. Cusick's opinion of Plaintiff's ability to work as an issue reserved to the Commissioner. (Doc. 28, at 10-11). The legal question of whether a claimant qualifies for benefits is reserved to the Commissioner, however, the ALJ "must consider a treating physician's view that the severity of a claimant's impairments makes her unable to work" when making the RFC determination. *Knapp v. Berryhill*, 741 F. Appx. 324, 327 (7th Cir. 2018) (citations omitted). Although Dr. Cusick's opinion that Plaintiff was unable to work full-time and that her ability to work part-time was limited was not entitled to controlling weight, the ALJ nonetheless was required to consider it. *See id.* But the ALJ did not do so.

The ALJ did not address the substance of Dr. Cusick's statement at all. While the ALJ criticized Dr. Cusick's failure to refer to treatment records to support his opinion, the ALJ's consideration of Dr. Cusick's treatment records is deficient. The ALJ mentioned only three of Plaintiff's visits to Dr. Cusick in July 2014, April 2017, and June 2017, including a recitation of various normal findings in June 2017. (R.21). But the ALJ ignored numerous records of regular treatment with Dr. Cusick from December 2003 through June 2017. (R. 430-46, 449-51, 1038-71, 1304-33, 1447-50, 1508-14). Since the January 2011 alleged onset date, those treatment records reflected a combination of positive and negative findings. The ALJ acknowledged almost none of those negative findings, including, for example: in August 2011, Plaintiff complained of panic episodes, insomnia, crying, and restlessness and, in November and December 2011, was depressed and felt worse after Dr. Cusick adjusted her medication (R. 1067, 1069); in September 2012, she

felt "anhedonic, listless, sad" (R. 1062); in January 2013, she was depressed, tearful/sad, and anxious and, in May and October 2013, was experiencing stress and feeling reluctant to make any changes (R. 1052, 1056, 1059); in 2014, Plaintiff was finding classes difficult and having difficulty concentrating, and she was depressed, anxious, and worried and had difficulty staying on task (R. 1042, 1044, 1048, 1050) and had symptoms including anhedonia, fatigue, or loss of energy, crying spells, and feelings of worthlessness and hopelessness (R. 1044); in February 2015, Plaintiff was easily distracted and, at times during the year, was depressed, anxious, and worried (R. 1304, 1306, 1308, 1310, 1313, 1315); in 2016, she was "tending to isolate" and feeling "depleted in the evening", and she generally was depressed and anxious (R. 1318, 1321, 1323, 1326, 1328, 1332); and, in early 2017, Plaintiff was depressed, anxious, worried, and irritable with poor attention concentration and intermittent suicidal/homicidal ideation (R. 1447-50, 1511-12), and she continued to experience ongoing anxiety in June 2017 (R. 1513-14). The ALJ did not address the vast majority of Plaintiff's regular treatment with Dr. Cusick or explain why she found the treatment records incompatible with the doctor's opinion of the extent of Plaintiff's limitations. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding."); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) ("the ALJ . . . may not dismiss a line of evidence contrary to the ruling.").

The ALJ also did not address any of the regulatory factors in order to weigh Dr. Cusick's opinion. *See* SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996) (treating source opinions "are still entitled to deference and must be weighed using all of the factors

provided in 20 C.F.R. § 404.1527"); *Lambert v. Berryhill*, 896 F.3d 768, 775 (7th Cir. 2018) ("ALJs must evaluate a treating physician's noncontrolling opinion by considering the treating relationship's length, nature, and extent; the opinion's supporting explanation and consistency with other evidence; and any specialty of the physician."); *Schreiber v. Colvin*, 519 Fed. Appx. 951, 959 (7th Cir. 2013) (ALJ must "sufficiently account[] for the factors in 20 C.F.R. § 404.1527"); *Campbell*, 627 F.3d at 308 (remanding where the ALJ did "not explicitly address the checklist of factors" listed in 20 C.F.R. § 404.1527 as applied to the medical opinion evidence).

As for Ms. Rivera (Plaintiff's therapist from January to May 2017), she opined in July 2017, that: Plaintiff could not form "mutually supportive relationships", had difficulties with supervisors, and experienced ongoing conflict with her family; had marked restriction in socialization, but not daily activities, concentration, attention, or task completion; was not able to function in a competitive full-time work setting; experienced fatigue and unspecified side effects from medication; and had made "some progress" in response to treatment and was "capable of working, but struggle[d] to maintain healthy relationships." (R. 1548-50). The ALJ did not discuss Ms. Rivera's medical source statement in any detail, but nonetheless stated that the RFC accounted for the conclusions that Plaintiff had "social limitations" and "problems with relationships". (R. 22). Overall, however, the ALJ gave Ms. Rivera's medical source statement only "[s]ome weight" because, according to the ALJ, Ms. Rivera's opinion that Plaintiff could not form "supportive relationships" was contradicted by the presence at an administrative hearing of a "friend" who Plaintiff described "as someone who supports her". (R. 22). This too falls short.

While the ALJ summarized portions of Ms. Rivera's treatment notes that supported the conclusion that Plaintiff was not as limited in terms of social functioning as alleged (R. 21), as with Dr. Cusick, the ALJ overlooked findings in the treatment records that were consistent with Ms. Rivera's opinion. Most significantly, the ALJ failed to acknowledge that the treatment records reflect that Ms. Rivera was aware of the friend who accompanied Plaintiff to the hearing ("Mommy Anna") when rendering the opinion that Plaintiff could not form "mutually supportive relationships" (not merely "supportive relationships", as the ALJ stated). (R. 22, 42, 1480, 1497, 1548). Further, those treatment records demonstrate only that Plaintiff told Ms. Rivera that she relied on this friend for support, but not that Plaintiff reciprocally provided support to her friend. (R. 1480, 1497).

The ALJ similarly ignored other findings in evaluating Ms. Rivera's medical source statement including, for example, Plaintiff's: anxiety related to attending a march and having conflict with her parents (R. 1478, 1480); isolation from and dissolving relations with her family as well as disconnection from her father (R. 1480, 1482, 1484); feelings of disappointment, betrayal, and unacceptance by others, loss of significant friendships, and ambivalence about having greater social connections. (R. 1484, 1499). In that way, too, the ALJ failed to address evidence that did not support her conclusion. *See Denton*, 596 F.3d at 425; *Villano*, 556 F.3d at 563.

For all of the foregoing reasons, the ALJ failed to build a logical bridge between the evidence and her conclusions with regard to the weight given to the opinions of Dr. Cusick and Ms. Rivera. The case must be remanded for further consideration of this issue.

### 2. State Agency Reviewing Physicians

Plaintiff next criticizes the ALJ's evaluation of the opinions of state agency reviewing physicians Drs. Henson and Gilliland as illogical and devoid of analysis. (Doc. 18, at 11). In July 2015, Dr. Henson opined that "[w]hile [Plaintiff] would have difficulty satisfactorily performing detailed activities of a somewhat complicated nature, she perform[ed] chores and leisure activities inside/outside the home and possesse[d] sufficient cognitive and attentional abilities to perform simple routine activities which . . . have few social demands." (R. 74-75). In October 2015, Dr. Gilliland opined that Plaintiff had moderate mental limitations in the ability to understand, remember, and carry out detailed instructions, moderate mental limitations in social interactions, and no significant mental limitations in adaptation and was "mentally capable of performing simple tasks in a routine schedule with reasonable rest periods and limited interaction with general public." (R. 99). The ALJ did not discuss the substance of those opinions and gave them only "[s]ome weight" (without indicating which aspects were credited) because the doctors did not review the entire record and did not explain the meaning of "reasonable rest periods". (R. 22).

The record contains mental health treatment records for Plaintiff through June 2017, so there is no question that the state agency reviewing physicians' opinions in 2015 were based on incomplete records. *See, e.g., Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (" . . . ALJ erred by continuing to rely on an outdated assessment by a non-examining physician . . . "); *Campbell*, 627 F.3d at 309 (reviewers' opinions may be entitled to less weight where they did not have the benefit of seeing complete treatment records). The ALJ accounted for that deficiency in according the opinions limited weight. (R. 22). And Plaintiff does not contend that those opinions are due more weight. (Doc.

18, at 11). As such, the Court finds no reason to reconsider on remand the ALJ's decision to discount the state agency reviewing physicians' opinions due to their limited review of the medical records.

As Plaintiff notes (Doc. 18, at 11), however, the ALJ also discounted both doctors' opinions for failing to explain what was meant by "reasonable rest periods" (a component of Dr. Gilliland's, but not Dr. Henson's, opinion). (R. 22, 74-75, 99). But, despite admittedly lacking such information, the ALJ nonetheless concluded (without elaboration) that the opinions did not require imposing additional functional limitations of "more or longer rest periods", and so did not include such limitations in the RFC. (R. 22). In that way, the ALJ failed to build a logical bridge to her decision to omit rest periods from the RFC determination. That aspect of the RFC determination should be addressed on remand.

### 3. Plaintiff's Mother

Plaintiff finally objects to the ALJ's decision to assign "[l]ittle weight" to the third-party function report completed by her mother. (Doc. 18, at 12). The ALJ did not mention any specific part of this function report, but blanketly discounted Plaintiff's mother's "observations" because she is not a treating source, medical professional, or impartial third-party. (R. 22). But Plaintiff identifies no statement of her mother purporting to reflect a greater degree of limitation than the RFC determination contains. As such, the Court sees no reason to revisit this statement on remand.

### D. Subjective Statements

Remand is also necessary to address flaws in the ALJ's assessment of Plaintiff's subjective statements regarding the severity of her symptoms. The regulations describe

a two-step process for evaluating a claimant's own description of her impairments. SSR 16-3p, 2017 WL 5180304, at *2. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." *Id.* at *3. Second, if there is such an impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . ." *Id.* In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations . . . and justify the finding with specific reasons." *Villano*, 556 F.3d at 562.

The Court gives the ALJ's assessment of a claimant's subjective symptom allegations "special deference and will overturn it only if it is patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (internal quotations omitted); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). A reviewing court should rarely disturb a subjective symptom assessment, as it lacks "the opportunity to observe the claimant testifying." *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). The claimant bears the burden of showing that an ALJ's subjective symptom evaluation is patently wrong. *See Horr v. Berryhill*, 743 F. Appx. 16, 20 (7th Cir. 2018).

In discounting Plaintiff's claimed degree of limitation, the ALJ noted that Plaintiff spent time hanging out with "a lot of friends" and was "courteous and considerate of them", her condition improved with medication, her claim of being exhausted after work was undocumented, and no evidence supported her claim of not trusting people. (R. 21-22). The ALJ's recitation of the evidence related to those findings is misleading and, at times,

inaccurate. On the one hand, the ALJ cited records of interviews conducted in May 2004 (long before the January 2011 alleged onset date) in connection with an evaluation for educational services to support the statements about Plaintiff's extensive and positive relationships with friends as well as her improvement with medication. (R. 21, 389, 391). On the other hand, as discussed in Section II.C above, the ALJ mostly ignored the treatment records of Dr. Cusick and Ms. Rivera after the alleged onset date, including those that documented Plaintiff tending to isolate; feeling depleted in the evening; experiencing disappointment, betrayal, and unacceptance by others; losing significant friendships; feeling ambivalence about having greater social connections; on at least one occasion, feeling worse after Dr. Cusick adjusted her medication; and continuing to work with her psychiatrist to "'get her medications right.'" (R. 1067, 1318, 1321, 1323, 1326, 1328, 1332, 1476, 1478, 1484, 1499).

The ALJ also emphasized that Plaintiff was in therapy for her disability case, her goal was to obtain benefits not to work, and she did not want to make changes. (R. 21). Again, the ALJ appeared to cherry-pick the records that supported those findings, but failed to discuss many counseling records that arguably undermined them. While it is true that Plaintiff told Ms. Rivera that she needed to stay in therapy for her disability case, the records also reflect that Plaintiff stated that she was "coming to therapy because her doctor told her to." (R. 1493). In addition, the records indicate that Plaintiff more actively engaged in therapy over time, she expressed interest in continuing with group therapy after individual therapy ended, and she expressed the view that her life had improved since starting therapy and that she had gained some skills from counseling. (R. 1472, 1474, 1480, 1492-93, 1497, 1499, 1501, 1503, 1505). The counseling records also do

not document Plaintiff's singular goal of obtaining benefits, as the ALJ suggests, but instead more broadly reflect Plaintiff's problems moving forward, including: ambivalence about taking control over her choices, taking greater responsibility for her life, and making change; taking small steps toward taking more ownership of her future, but not being ready to take action; not wanting to talk about ways to move forward toward her long-term goal of working in a field that brings her more satisfaction; and not taking necessary steps to alleviate her symptoms of depression and to make changes leading to her long-term goals. (R. 1472, 1484, 1486, 1488, 1495, 1499). The Court does not suggest that consideration of those records requires a different result, only that the ALJ should address such evidence and explain its impact (if any) on the subjective symptom assessment.

For the foregoing reasons, this case is remanded for further proceedings consistent with this opinion to reassess Plaintiff's subjective statements about her mental limitations.

## CONCLUSION

For the reasons stated above, Plaintiff's request for remand (Doc. 17) is granted as outlined above, and the Commissioner's Motion for Summary Judgment (Doc. 28) is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Social Security Administration for further proceedings consistent with this Order.

ENTER:

Dated: May 22, 2020

_____
SHEILA FINNEGAN
United States Magistrate Judge

35